John O. WORTH, d/b/a Worth Law Offices, Plaintiff,

v.

TAMARACK AMERICAN, a Division of Great American Insurance Co., and American National Fire Insurance Co., a subsidiary of Great American Insurance Co., Defendant.

No. IP 97–1757 CB/S.

United States District Court, S.D. Indiana, Indianapolis Division.

March 31, 1999.

---

Rodney V. Taylor, Christopher & Taylor, Indianapolis, IN, for plaintiff.

G. Ronald Heath, Johnson Smith Pence Densborn Wright & Heath, Indianapolis, IN, for defendants.

## ENTRY GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

Plaintiff, John O. Worth ("Worth"), brings this bad faith and declaratory judgment action against his insurer, American National Fire Insurance Company ("American National"), and against the processors of his claim, Tamarack American ("Tamarack"). Worth alleges that defendants acted in bad faith in denying his claim and he seeks a declaration that the professional liability insurance policy he purchased from American National obligates defendants to defend and indemnify him in an underlying legal malpractice action brought against him by a former client. All parties, plaintiff and defendants, move for summary judgment. For the reasons discussed, defendants' motions for summary judgment are *GRANTED* and plaintiff's motion for summary judgment is *DENIED*.

### Relevant Background

John O. Worth practices law in Rush County, Indiana. In the late 1980's, Larry Clock ("Clock"), a farmer, retained Worth to advise him on his struggling farming business. Over the course of the next several years, Worth represented Clock in three different actions: Mr. Clock's divorce from his wife, a lawsuit against the United States alleging improprieties in the administration of the Agricultural Stabilization and Conservation Service program ("ASCS"), and a Chapter 7 bankruptcy filing. *See* Pl.'s Br.Summ.J. at 1–2.

On August 5, 1991, three days before the running of the statute of limitations, Worth filed the ASCS suit on Clock's behalf in

the Southern District of Indiana (coincidentally in this very court), pursuant to the Federal Tort Claims Act. While reviewing Clock's business records in 1989, Worth discovered a potential claim against the Department of Agriculture. *See* Worth Dep. at 12, 14–15. The claim rested on the theory that the Farmer's Home Administration ("FMHA") and the Blackford County ASCS did not permit Clock to sell stored grain at an optimal time to maximize profits. *See* Tamarack's Br. Summ.J. at 6; Worth Dep. at 12. Worth surmised that the possible recovery from the ASCS suit could be used to offset the amount Clock owed to the FMHA. *See* Worth Dep. at 12, 14–15.

On August 30, 1991, an Indiana state court apparently issued a decree finalizing the Worth divorce, specifying that any recovery from the ASCS claim would be divided equally between Mr. Worth and his ex-wife. *See* Pl.'s Br.Summ.J. at 1–2.

On November 21, 1991, this Court ordered Worth to show cause, on or before December 5, 1991 (December 3, 1991 represented the 120th day after the August 5, 1991 filing of the complaint), why the ASCS action should not be dismissed for failure to perfect service on the defendant, the United States of America, pursuant to Federal Rules of Civil Procedure 4(d), 4(j) and 41(b).[1] On December 10, 1991, Worth filed a motion for an extension of time until December 21, 1991 to respond to the Court's Order, claiming that he had not received our order until December 9, 1991.

Nonetheless, on December 11, 1991, we granted Worth's motion for an extension.

On December 30, 1991, nine days after Worth neglected to comply with his self-imposed deadline to respond to our Order to Show Cause why the case should not be dismissed, and 27 days after the deadline to effect service of process upon the defendant as required by Rule 4, Worth filed his response. He claimed that he had forwarded a copy of the complaint and summons to an assistant United States attorney in the Southern District of Indiana, and that he had forwarded a certified copy of the pleadings to the Attorney General of the United States in Washington, D.C.; (we would learn subsequently that Worth forwarded these pleadings on December 27 and December 31, 1991 respectively). *See* Worth's Dec. 30, 1991 Response to Order to Show Cause; Worth's April 21, 1992 Response Def.'s Mot. Dismiss.

On February 25, 1992, the government filed a motion to dismiss Clock's ASCS complaint, contending that Worth failed to effect service of the complaint and summons in the manner required by Federal Rule of Civil Procedure 4(d). Namely, the government contended that Rule 4 mandated that Worth serve process upon both the United States attorney, or his/her official designee, and the Attorney General of the United States within 120 days after filing the complaint. In other words, December 3, 1991 represented Worth's last day to serve process upon the required persons before mandatory dismissal of Clock's claim, absent a showing by Worth

---

1. In 1991–92, Federal Rule of Civil Procedure 4(d) required the following actions to effect service upon the United States:

[A plaintiff must effect service of process] [u]pon the United States, by delivering a copy of the summons and of the complaint to the United States attorney for the district in which the action is brought or to an assistant United States attorney or clerical employee designated by the United States attorney in a writing filed with the clerk of the court and by sending a copy of the summons and of the complaint by registered or certified mail to the Attorney General of the United States at Washington, District of Columbia, and in any

action attacking the validity of an order of an officer or agency of the United States not made a party, by also sending a copy of the summons and of the complaint by registered or certified mail to such officer or agency.

Additionally, in 1991–92, Federal Rule of Civil Procedure 40(j) provided, in relevant part, that:

If a service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant....

of "good cause" excusing his failure to comply with Rule 4 requirements. The government also asserted that since the statute of limitations had run on Clock's ASCS complaint, a Rule 4 dismissal for failure to effect service of process would completely bar any future filing of the ASCS action.[2]

Despite the looming dismissal of his client's complaint, Worth remained silent in responding to the government's motion to dismiss for well over 30 days. On April 8, 1992, this Court ordered Worth to show cause before April 23, 1992 why the government's unopposed motion to dismiss should not be granted. On April 21, 1992, Clock filed a two-page response, claiming (without supporting evidence) that he had perfected service upon "Gary Hobbs," an individual who Worth claimed was both an ASCS employee and an agent of the United States.[3] Worth also claimed that his tardy mailing of the ASCS complaint to the Attorney General of the United States and to an Assistant United States Attorney in this District constituted proper service of process and that, in any event, the United States somehow had actual notice of the action within the 120 day period despite the lack of formal service. Worth never provided any reason for his failure to serve process upon the appropriate individuals within the required 120 day time period, nor did he attempt to offer a "good cause" explanation for his inaction.

On June 26, 1992, we issued an Entry dismissing the ASCS complaint with preju-

dice, finding Worth's response to the government's motion to dismiss "entirely unavailing, both on the facts and the law." Court's June 26, 1992 Entry at 2. We noted that a suit brought against the United States under the Federal Tort Claims Act requires compliance with Rule 4, which mandates delivery of a copy of the summons and complaint to the U.S. Attorney for the district in which the action is brought (or the designated employee of that office) and the sending of the same pleadings to the Attorney General of the United States at Washington D.C. We found Worth's purported service of process upon Gary Hobbs a completely insufficient attempt to comply with Rule 4, terming it "suspicious" in light of Hobbs' resignation from ASCS well over a year before Worth filed the ASCS complaint, and finding that Worth failed to serve the United States even assuming he had succeeded in serving Gary Hobbs. *Id.* at 3.

We further held that Worth's failure to serve the United States by December 3, 1991 mandated dismissal of the ASCS action absent a showing that the delay was based on good cause, remarking that "plaintiff's counsel has offered no explanation or excuse for his failure to meet that deadline, not to mention his failure to make a showing of 'good cause.'" *Id.* at 4. We concluded that although a dismissal prompted by failure to comply with Rule 4(j) is generally a dismissal without prejudice, we dismissed the ASCS action with prejudice since the six-month statute of

---

**2.** The parties do not dispute that under the Federal Tort Claims Act, 28 U.S.C. 2401(b), the statute of limitations on Clock's ASCS claim ran on August 8, 1991, six months after the United States Department of Agriculture mailed its February 8, 1991 denial of Clock's claim. Indeed, the Department's denial expressly advised Worth of the six month statute of limitations: "You are advised of your client's right to file suit in an appropriate United States district court within six months of the date of the mailing of this letter if he is dissatisfied with the results of this determination." Gov't Feb. 25, 1991 Br. Support Mot. Dismiss (Attachment B).

**3.** The only service of process filed in the ASCS action was sent to the State ASCS Office in Indianapolis, Indiana in August, 1991. Contrary to Worth's dubious representation that he believed that he served Gary Hobbs sometime after filing the ASCS complaint on August 5, 1991, Gary Hobbs had resigned from his position as Blackford County's Director of ASCS over a year and one-half earlier. *See* Def.'s May 6, 1991 Reply to Pl.'s Response to Def.'s Mot. Dismiss. In any event, service of process upon either the ASCS office or Gary Hobbs would have failed to satisfy the requirements of Rule 4.

limitations had passed since the date the Department of Agriculture mailed notice of final denial of Clock's claim (February 8, 1991), thereby foreclosing any future filing of the ASCS action after our dismissal.

On May 18, 1992, almost a month after Worth finally responded to the government's motion to dismiss the ASCS action, Worth filed a Chapter 7 bankruptcy petition on behalf of his client, Larry Clock. Worth listed the ASCS suit as an asset of the bankruptcy estate, as we had not ruled on the fully briefed motion to dismiss by that date. As mentioned, on June 26, 1992, we dismissed the ASCS complaint and mailed a copy of our entry to Worth, which he apparently received. *See* Worth Dep. at 22, 15. On September 28, 1992, Clock received a Chapter 7 bankruptcy discharge.

On March 6, 1997, more than four years after dismissal of the ASCS action, and after Clock filed a complaint with the Indiana Supreme Court Disciplinary Commission, Clock brought a malpractice and fraud action against Worth. *See* Tamarack's Ex. 13 (Clock V.Compl.). Clock alleged that Worth's negligence in failing to serve process upon the United States in the ASCS action resulted in its dismissal. He also alleged that Worth defrauded him by intentionally concealing the fact that the ASCS action had been dismissed. Specifically, Clock claimed that Worth never informed him of the dismissal despite numerous personal meetings related to his bankruptcy, that Worth failed to disclose the dismissal during telephone conversations, that Worth avoided returning his telephone calls as late as September 1995, and that Clock wrote letters to Worth after the 1992 dismissal confirming that Clock still believed the case was active. *See* Tamarack's Ex. 13 (Clock V.Compl.), Exs. 19, 20. Clock maintained that he learned of Worth's alleged negligence for the first time on July 9, 1996, when he sought legal counsel from Cohen & Malad and retained a copy of the court docket reflecting the dismissal.

Defendants received notice of the malpractice action on March 18, 1997.[4] On March 26, 1997, Tamarack sent Worth a letter, in which it denied coverage, refused to defend the action, detailed the basis for its decision, and reserved the right to file a declaratory judgment action. *See* Tamarack's Ex. 17.

Worth comes before us now seeking a declaratory judgment that the "claims made" professional liability insurance policy he purchased from American National in 1995 obligates defendants to defend and indemnify him in Clock's legal malpractice action. Worth alleges that the policy had effective dates of July 31, 1995 through July 31, 1997, and that Clock's 1996 malpractice claim therefore falls within policy coverage. Worth also demands compensatory and punitive damages for defendants' alleged failure to exercise reasonable skill and diligence in investigating and defending the malpractice action, contending that defendants have acted in bad faith and breached their implied covenant of good faith and fair dealing by refusing to defend the malpractice action.

---

**4.** We employ the term "defendants" merely for simplicity, as both defendants have adopted the same legal position in this case. We fully recognize that defendant American National and defendant Tamarack are distinct entities, and that Worth failed to sue American National, the true insurer in this case, until the latter stages of this litigation. We also note that while Worth claims that both defendants have a duty to defend and indemnify him, Tamarack merely served as American National's claims processor and has never issued an insurance policy to Worth other than on behalf of American National. We need not continually distinguish between the two defendants, however, in light of our ruling that American National, through its claims processor Tamarack, properly refused to defend Worth in the underlying malpractice action and that Tamarack acted reasonably and in good faith in performing its duties. Moreover, Worth cites no evidence that the defendants ever attempted to conceal or manipulate their relationship, much less that they did so to his detriment.

American National and Tamarack rejoin that coverage under the policy extends to claims based on events that occurred prior to its effective date, but only where, prior to the policy coverage, Worth had no reasonable basis either to believe that he had breached a professional duty as a result of any prior act, error or omission, or to foresee that a claim would be made against him based upon such prior act, error or omission. The defendants contend that the undisputed evidence reveals that Worth had a reasonable basis to believe before the July 31, 1995 policy inception that his failure to perfect service upon the United States in the ASCS action constituted a breach of professional duty to Clock. Defendants also contend that they conducted a reasonable investigation before denying coverage and that they have acted in good faith during the course of that determination.[5] We now turn to the merits of these contentions.

### *Discussion*

#### A. *Summary Judgment Standards and Applicable Indiana Insurance Law*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986);

*Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998).

In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992). Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989). Yet, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but also required. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir.1989).

As a federal court sitting in diversity, we must evaluate Indiana law as it pertains to this dispute. *See Colip v. Clare,* 26 F.3d 712, 714 (7th Cir.1994). Under Indiana law, a contract for insurance is subject to the same rules of interpretation as are other contracts. *See USA Life One Ins. Co. v. Nuckolls,* 682 N.E.2d 534, 537–38 (Ind.1997). The interpretation is "primarily a question of law for the court, even if the policy contains an ambiguity needing resolution." *Id.* (*quoting Tate v. Secura Ins.,* 587 N.E.2d 665, 668 (Ind.1992)). The insured is required to prove that her claims fall within the coverage provision of her policy, but the insurer bears the burden of proving specific exclusions or limitations to policy coverage.

---

5. Defendants also claim that Worth's insurance policy unambiguously excludes coverage for Clock's allegations that (1) Worth intentionally and willfully concealed the ASCS dismissal from Clock, and (2) punitive damages are warranted in the malpractice action. *See* Tamarack's Br.Summ.J. at 23–24. Worth does not dispute or even acknowledge defendants' coverage position on these aspects of Clock's malpractice claim, choosing instead only to address the negligence aspects of Clock's malpractice allegations. Upon review of the insurance policy and defendants' pleadings, we agree that they have no duty to defend or indemnify Worth for any of Clock's claims pertaining to punitive damages or intentional or willful conduct, and we accordingly *GRANT* defendants' motions for summary judgment in those respects.

*See Erie Ins. Group. v. Sear Corp.*, 102 F.3d 889, 892 (7th Cir.1996) (applying Indiana law). The insurer's duty to defend, which is broader than its duty to indemnify, is determined by the nature of the claim in the underlying complaint, not its merits. *See Ticor Title Ins. Co. v. FFCA/IIP 1988 Prop. Co.*, 898 F.Supp. 633, 638 (N.D.Ind.1995) (applying Indiana law). An insurer must defend an action even if only a small portion of the conduct alleged in the complaint falls within the scope of the insurance policy. *See Curtis–Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.*, 43 F.3d 1119, 1122 (7th Cir.1994).

 If the insurance policy is clear and unambiguous, then it should be given its plain and ordinary meaning. *See Nuckolls*, 682 N.E.2d at 537–38. When an insurance company has failed to clearly exclude that which the insured attempted to protect against, a court must construe any ambiguous contract to further the policy's basic purpose of indemnity. *Id.* Yet, when the underlying factual basis of the complaint, even if proved true, would not result in liability under the insurance policy, the insurance company can properly refuse to defend. *See Wayne Township Bd. of Sch. Comm'rs v. Indiana Ins. Co.*, 650 N.E.2d 1205, 1208 (Ind.Ct.App.1995).

### B. Policy Coverage

 The parties do not dispute that if Worth had a reasonable basis to believe, prior to policy coverage, that he had breached a professional duty as a result of an undisclosed act, error, or omission that occurred before the effective date of policy coverage, the defendants properly have refused to defend Clock's malpractice action. (Worth never notified defendants of the prior ASCS dismissal when purchasing policy coverage.) Therefore, the parties form battle lines over whether Worth had a reasonable basis to believe, prior to policy coverage, that the ASCS dismissal constituted a breach of professional duty owed to his client. We harbor no reluctance in concluding that Worth had a reasonable basis to believe, at or before the time the policy became effective, that he breached a professional duty to Clock when he failed both to comply with Federal Rule of Civil Procedure 4(d) & (j) and to offer a good faith excuse for doing so, resulting in our dismissal of the ASCS action with prejudice.

The American National "claims made" insurance policy purchased by Worth provides coverage for damages resulting from "claims first made against [Worth] during the policy period and reported to the company during the policy period [July 31, 1995 through July 31, 1997]." *See* Tamarack's Ex. 1. The parties do not dispute that Larry Clock filed his March 6, 1996 malpractice claim for the first time within the policy period and that Worth reported the claim to defendants in timely fashion. The coverage section of the policy, however, adds an important caveat, denying coverage for acts, errors or omissions that occurred prior to the policy period unless Worth had "no reasonable basis to believe that [he] had breached a professional duty or to foresee that a claim would be made against [him]." *Id.*[6]

---

**6.** The relevant portion of the coverage provision reads:

**II. COVERAGE**
**A. Professional Liability and Claims Made Clause:** This policy shall pay on behalf of each insured all sums in excess of the deductible amount ... which the Insured shall become legally obligated to pay as damages as a result of **CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND RE-**

PORTED TO THE COMPANY DURING THE POLICY PERIOD

. . . . .

**PROVIDED ALWAYS THAT** such act, error or omission or personal injury happens:
1. during the policy period; or
2. prior to the policy period, provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by the Company to the named Insured and continuously renewed and main-

█ The parties agree that we should assess the reasonableness of Worth's belief under an objective standard, asking whether a reasonable attorney in Worth's position would have believed he had breached a professional duty to Clock before the effective date of policy coverage. *See* Pl.'s Response to Def.'s Mot. and Br. Support Summ.J. at 3–4; Tamarack's Br.Summ.J. at 19–23; *Mt. Airy Ins. Co. v. Thomas*, 954 F.Supp. 1073, 1074–79 (W.D.Pa.1997), *aff'd*, 149 F.3d 1165 (1998); *Coregis Ins. Co. v. Camico Mut. Ins. Co.*, 959 F.Supp. 1213, 1222 (C.D.Cal.1997); *International Ins. Co. v. Peabody Int'l Corp.*, 747 F.Supp. 477, 483–84 (N.D.Ill.1990).

Worth contends that the defendants did not adequately investigate the circumstances prompting dismissal of the ASCS action. He asserts without citation to any evidence in the record that a proper investigation would have revealed three key facts establishing that Worth did not have a reasonable basis to believe that he had breached a professional duty to Clock. *See* Pl.'s Br.Summ.J. at 13–14.

First, Worth claims that he "committed no negligence" since he believes he was absolved from pursuing the ASCS action upon his filing of Clock's Chapter 7 bankruptcy petition in May, 1992. *Id.* In effect, he argues that he filed the ASCS action to protect a speculative claim and to forestall creditors until the filing of the bankruptcy petition, and that after the bankruptcy filing, "the pursuit of the ASCS claim was in the hands of the Trustee." *Id.* Second, Worth disputes the merits of the underlying malpractice claim, contending that Clock could not prove damages from the ASCS dismissal since any potential recov-

ery on the action would have benefitted only the bankruptcy creditors, not Clock. Thus, "[i]f anyone was injured by the actions of Worth, it was the creditors and/or the trustee." *Id.* Third, even if he committed malpractice, Worth reiterates that any damages flowing from the breach would have been discharged in bankruptcy or pursued to the benefit of the creditors (again suggesting that Clock could not prove that he was damaged by Worth's alleged negligence). *Id.*

█ We find Worth's contentions seriously wanting in a number of respects, only a few of which we need develop for purposes of summary judgment. At the outset, we are convinced as a matter of law that Worth breached a professional duty to his client by failing to comply with Federal Rule of Civil Procedure 4(d) & (j). While we express no opinion on the merits of Clock's underlying malpractice claim, the first two elements of a legal malpractice claim under Indiana law provide guidance on whether Worth breached a professional duty. In Indiana, a plaintiff-client bringing a malpractice action must show (1) employment of an attorney (duty), (2) failure by the attorney to exercise ordinary skill and knowledge (breach), (3) proximate cause (causation), and (4) loss to the plaintiff (damages). *See Fricke v. Gray*, 705 N.E.2d 1027, 1033 (Ind.Ct.App.1999); *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338, 344 (Ind.1991).

█ In assessing policy coverage in this case, elements three and four (causation and damages), arguably the more difficult hurdles to negotiate in a malpractice action,[7] are beside the point in determining

---

tained in effect to the inception of this policy period:

(a) the Insured did not give notice to any prior insurer of any such act, error or omission; and

(b) the Insured had no reasonable basis to believe that the Insured had breached a professional duty or to foresee that a claim would be made against the Insured; and

(c) there is no prior policy or policies which provide insurance for such liability or claim, ...

Tamarack's Ex. 1.

7. To prove causation and the extent of the any alleged injury, the plaintiff-client must demonstrate that the outcome of the underlying litigation would have been more favorable but for the attorney's negligence. *See Picadilly*, 582 N.E.2d at 344. This proof typically re-

whether a reasonable attorney in Worth's position had a reasonable basis to believe that he/she had breached a professional duty to Larry Clock. As for the first element, it is undisputed that Worth represented Clock in the ASCS action and that the attorney-client relationship continued well past the dismissal. The parties never suggest or cite any evidence that Clock either requested termination of the ASCS proceeding or otherwise relieved Worth of his duty to pursue that litigation.

▋ As for the second element, we are immediately struck with the force by which the undisputed facts demonstrate that Worth failed to exercise ordinary skill and knowledge in complying with Federal Rule of Civil Procedure 4(d) & (j). One of the most fundamental duties an attorney owes to his or her client is loosening the litigation from its moorings and effectuating proper service of process.[8] Often, as in a case such as this, the attorney need only extend an arm, select the appropriate federal or state rules book (which we would hope is nearby), and familiarize himself or herself with the applicable service requirements. *See Baker v. Dorfman*, No. 97 CIV. 7512(DLC), 1998 WL 642762 (S.D.N.Y. Sept.17, 1998) (finding that attorney's failure to conduct the minimal investigation necessary to determine the relevant statutory limitations for filing a client's claims, and to file those claims in a timely manner, constitutes "negligence as

a matter of law"). Where an attorney is uncomfortable with or unsure about service of process for a particular defendant, we would imagine that such discomfort would compel an attorney exercising ordinary skill and intelligence to be more diligent in getting it right, especially if the statute of limitations has run and that initiative represents the client's only opportunity to recover on the claim. *See, e.g., Fricke v. Gray*, 705 N.E.2d 1027, 1033 (Ind.Ct.App.1999) (attorneys who failed to file client's lawsuit within the statute of limitations committed "negligence," although the jury properly determined that the attorney was not liable for malpractice since the client failed to prove causation).

Remarkably, Worth has not attempted, never mind succeeded, in ever explaining his gross failure to serve the United States within the 120 day deadline of filing the ASCS action, as mandated by Rule 4(j). Indeed, we afforded Worth extraordinary leeway during the brief life-span of the ASCS litigation to explain his failure to comply with Rule 4 and avoid dismissal: (1) we notified Worth by written entry on November 21, 1991 that he had until December 3, 1991 to effect service before the Rule 4 deadline would pass, (2) we tolerated Worth's excuse that he did not receive our written entry until December 9, 1991 and granted his request for an extension of time until December 21, 1991 to respond to our order to show cause why the case should not be dismissed, (3) we overlooked

quires a "trial within a trial," with the measure of damages being the value of the claim lost. *Id.; Schneider v. Wilson*, 521 N.E.2d 1341, 1343 (Ind.Ct.App.1988). A determination of whether Clock has succeeded in establishing a prima facie case of legal malpractice is not essential to our resolution of this case, and we accordingly refrain from stepping into the province of the Indiana trial court responsible for adjudicating Clock's malpractice claim.

8. New York's highest state court effectively captured the importance of an attorney's duty to serve process in a timely and accurate manner:
[T]he duty at issue here—that owed by an attorney to his or her client to exercise care in

the service of process—fits squarely and neatly within the category of obligations the law regards as "nondelegable." Manifestly, when an individual retains an attorney to commence an action, timely and accurate service of process is an integral part of the task that the attorney undertakes. Furthermore, proper service of process is a particularly critical component of a lawyer's over-all responsibility for commencing a client's lawsuit, since a mistake or oversight in this area can deprive the client of his or her day in court regardless of how meritorious the client's claim might be.
*Kleeman v. Rheingold*, 81 N.Y.2d 270, 598 N.Y.S.2d 149, 154, 614 N.E.2d 712 (1993).

his failure to meet his own December 21 deadline to respond to our show cause order and still considered his delinquent response, and (4) we took great pains (despite Worth's recurrent shortcomings in addressing the issue) to avoid granting the government's February 25, 1992 unopposed motion to dismiss the ASCS action for failure to perfect service, and instead entered an order on April 8, 1992 urging Worth to respond by April 22, 1992 and show cause why the case should not be dismissed.

In an odd reversal of roles, we found ourselves pleading with Worth to provide us with some basis to resuscitate his client's faltering claim. If our prodding of Worth did not impress upon him the stakes at risk, he undoubtedly knew that the statute of limitations had run mere days after he filed the ASCS complaint (he does not deny as much), as the Department of Agriculture's February 8, 1991 denial letter expressly notified him that he had only six months in which to file a federal lawsuit. Despite our carrot and stick approach, Worth has failed to this day to provide any reason or good cause excuse for his failure to comply with the dictates of Rule 4. It is a mind-numbing exercise in fathoming how a reasonable attorney could read our June 26, 1992 dismissal of the ASCS action, which we wrote in unequivocal language, and not be on notice that his failure to comply with a straightforward federal rule of civil procedure constituted a breach of a professional duty to his/her client. *See, e.g., Fricke*, 705 N.E.2d at 1033; *Basinger v. Sullivan*, 540 N.E.2d 91 (Ind.Ct.App.1989) (identifying attorney malpractice where attorney allowed limitation period to lapse on client's potential lawsuit, but finding that clients were themselves barred from recovery by a statute of limitations); *Baker*, 1998 WL 642762 at *3–4 (finding that an attorney's failure to serve a timely notice of client's claim, his failure to seek leave to serve a late notice of a client's claim, and his failure to file his client's complaint within the applicable statute of limitations

constituted negligence); *Home Indem. Co. v. Toombs*, 910 F.Supp. 1569, 1574 (N.D.Ga.1995) (holding that an attorney who entered an appearance in an existing action, voluntarily dismissed that action, and subsequently refiled it after the statute of limitations had run possessed a reasonable basis to believe that he had breached a professional duty as a matter of law); *Stanski v. Ezersky*, 210 A.D.2d 186, 621 N.Y.S.2d 18, 19 (N.Y.App.Div. 1994) (finding negligence as a matter of law where attorney failed to effect proper service in client's action and statute of limitations subsequently barred further action).

Our conclusion is not altered by the "three items" that Worth claims the defendants would have discovered if they had investigated the underlying malpractice complaint more thoroughly. Pl.'s Br. Summ.J. at 13. Worth's first "item," that Clock had no reasonable basis to believe he had breached a professional duty because there "was no need to pursue the district court case" upon filing the bankruptcy petition, is a red herring, and a wounded one at that. *Id.*

 Worth filed Clock's Chapter 7 petition on May 18, 1992, months *after* the December 3, 1991 service of process deadline and well after the briefing on the government's motion to dismiss for failure to perfect service had closed. In fact, in Worth's April 21, 1992 two-page response to the government's motion to dismiss, which he filed only after we ordered him to show cause why we should not grant the government's unopposed motion, Worth never mentioned any bankruptcy preparations or how those efforts would excuse his failure to pursue the ASCS litigation. On the contrary, Worth had a duty to deliver the ASCS litigation to the bankruptcy trustee intact, and the mere fact that he actually filed a bankruptcy petition does not allow him to turn a blind eye to the

damage done to his client's case prior to that filing.[9]

While we did not issue our opinion dismissing the ASCS action until June 26, 1992, a month after the bankruptcy filing, the basis of our decision clearly rested on Worth's activity (or lack thereof) between the filing of the ASCS action on August 5, 1991 and the service of process deadline on December 3, 1991. Regardless of the filing of the bankruptcy petition, Worth's own failure to perfect service of process, coupled with our entry dismissing the ASCS lawsuit as a result of Worth's omission, would have given a reasonable attorney in Worth's position a "reasonable basis to believe" that he or she had breached a professional duty to his or her client.

Worth's final two "items" that he claims trigger the defendants' duty to defend in this case relate to causation and damages, two elements of the tort of legal malpractice that are beyond our narrow inquiry here concerning the breach of a professional duty. While Worth may be correct that any recovery from the ASCS action would become an asset of the bankruptcy estate, and that Clock's creditors may have been entitled to any recovery from the ASCS action, those assertions do nothing to erode Worth's reasonable basis to believe that he breached a duty to Clock by failing to comply with Federal Rule of Civil Procedure 4(d) & (j).[10]

The insurance provision excepting coverage for acts and omissions that occurred prior to policy coverage exists for a reason—it encourages would-be insureds to disclose any reasonable basis to believe that a prior act or omission resulted in a breach of professional duty. By inducing would-be insureds to disclose potential or actual breaches of professional duty, the insurer is better able to assess the risk of extending insurance, thereby adjusting premium levels, altering the type of insurance extended, or denying coverage altogether if the insurer believes that such a breach might ripen into a valid malpractice action during the coverage period.

Even if Worth did not believe that Clock would succeed in proving causation or damages in a malpractice action, he had a reasonable basis to believe that he previously had breached a professional duty when he obtained policy coverage in 1995. Worth nonetheless chose not to report the ASCS dismissal when purchasing a "claims made" insurance policy containing clear and unambiguous language that excluded coverage for known omissions and errors occurring prior to policy coverage.[11] Accordingly, we find that based upon the undisputed facts, defendants properly refused to defend and indemnify Worth in Clock's underlying malpractice action, which clearly and obviously is excluded

**9.** We also note in passing that we disagree with Worth's suggestion that filing a Chapter 7 petition necessarily relieves attorneys of all responsibility for pre-bankruptcy litigation filed by the bankrupt/debtor. Unlike situations where the debtor is the defendant in litigation, the automatic stay provision of the bankruptcy code does not freeze litigation where the debtor is the plaintiff. *See Martin–Trigona v. Champion Fed. Sav. & Loan Ass'n,* 892 F.2d 575, 577 (7th Cir.1989) ("For in any event the automatic stay is inapplicable to suits by the bankrupt ('debtor,' as he is now called.")). Moreover, even though a lawsuit may be an asset of the bankruptcy estate, a bankruptcy trustee may abandon the litigation, leaving the debtor/plaintiff to continue the fight outside the purview of the bankruptcy action. *See Bittel v. Yamato Int'l Corp.,* 70 F.3d 1271 (table), 1995 WL 699672 (6th Cir.

Nov.27, 1995) (discussing abandonment and explaining that bankruptcy debtor may bring suit if the trustee has abandoned his interest in the cause of action).

**10.** We also reserve opinion as to whether Worth is correct that Clock would not have benefitted if his creditors had recovered any amounts from the ASCS action. *Cf. Bittel,* 70 F.3d 1271, 1995 WL 699672, at *2 (noting that monetary recovery for a debtor/bankrupt's creditors "assists the debtor's financial rehabilitation").

**11.** The parties have not informed us whether Worth obtained insurance coverage for the 1991–92 period when his error/omission occurred, and if so, whether Worth informed that insurer of the ASCS dismissal.

from coverage under Worth's insurance policy.

### C. Defendants' Investigation of the Malpractice Action and Bad Faith

Instead of disputing that he breached a professional duty, Worth devotes most of his efforts to establishing that if the defendants had investigated Clock's malpractice claim more thoroughly, they would have discovered three "things" (discussed *supra*) related to the bankruptcy filing that trigger the defendants' duty to defend in this case. Given the paucity of the additional facts Worth identifies, and our ruling that the defendants properly refused to defend Worth in the underlying malpractice action, Worth's remaining claim sounds in an allegation of bad faith. He contends that defendants violated their duty to act in good faith towards Worth by refusing to defend the malpractice action without first investigating it adequately.

■ As a preliminary matter, Indiana has long recognized the rule that "insurance companies may, in good faith, dispute claims." *Erie Ins. Co. v. Hickman,* 622 N.E.2d 515, 520 (Ind.1993). When the underlying factual basis of the complaint, even if proved true, would not result in liability under the insurance policy, the insurance company can properly refuse to defend, although it does so at its own peril if its coverage position is later determined to be erroneous. *See Liberty Mut. Ins. Co. v. Metzler,* 586 N.E.2d 897, 902 (Ind. Ct.App.1992); *Cincinnati Ins. Co. v. Mallon,* 409 N.E.2d 1100 (Ind.Ct.App.1980).

■ We also are aware that while the Indiana Supreme Court has held that an insurer's "duty to defend is determined solely by the nature of the complaint," *Transamerica Insurance Services v. Kopko,* 570 N.E.2d 1283, 1285 (Ind.1991), the Indiana Court of Appeals subsequently has held that an insurer may have a duty to investigate the facts underlying a complaint before it may refuse to defend. *Compare Kopko,* 570 N.E.2d at 1285

("When the nature of the claim is obviously not covered by the policy of insurance, there is no duty to defend.") *with Monroe Guar. Ins. Co. v. Monroe,* 677 N.E.2d 620, 623 (Ind.Ct.App.1997) (distinguishing *Kopko* as a case where the parties did not dispute the facts underlying the complaint, and finding that on the facts before the court, the insurer had "a duty to conduct a reasonable investigation into the facts underlying the complaint before it may refuse to defend the complaint"). Worth recognizes that *Monroe Guaranty* never defined what constitutes a "reasonable" investigation by an insurer, but he urges us to declare that the defendants' actions in denying coverage were inadequate and in bad faith. We decline to do so and instead find that the defendants' efforts prior to denying coverage were manifestly reasonable in light of the facts of this case.

Defendant Tamarack received notice of Clock's malpractice action against Worth on March 18, 1997. Tamarack acknowledged receipt of the claim by sending Worth a return letter on that same date informing Worth that he would be contacted shortly by a litigation manager. Tamarack assigned Carol Ho–Rezvani ("Ho–Rezvani"), a claims manager with 12 years of experience and a law degree, to handle Worth's case. Ho–Rezvani obtained and reviewed Clock's Verified Complaint, this Court's June 26, 1992 Entry dismissing the ASCS action, and copies of the Court's docket verifying the dismissal. She reviewed Worth's insurance policy, including the coverage provisions at issue, and attempted to contact Worth by telephone to no avail.

The next day, March 19, 1997, Worth returned Ho–Rezvani's telephone call and she advised him of potential problems with policy coverage. She informed him that coverage may not exist for Clock's negligence claim because Worth may have had a reasonable basis to believe that he had breached a duty to Clock by failing to perfect service in the ASCS action. Worth also verbally confirmed that in 1992 he had

received a copy of this Court's Entry dismissing the ASCS action. On or about March 21, 1997, Ho–Rezvani discussed Worth's claim with in-house counsel and retained outside coverage counsel to render an opinion on whether the insurance policy afforded Worth coverage for Clock's malpractice action. She faxed Clock's malpractice complaint, this Court's Entry dismissing the ASCS action, the docket sheet, and the Worth insurance policy to outside counsel in Chicago. Counsel responded within 4–5 days by providing a draft letter denying coverage for the malpractice action, which Ho–Rezvani revised and sent to Worth on March 26, 1997.

Ho–Rezvani's letter notified Worth that Tamarack was denying coverage for the malpractice action and would not provide him a defense. She included the "Coverage" provision of the policy and noted that he had received this Court's Entry dismissing the ASCS action due to Worth's failure to comply with the service requirements of Rule 4. Therefore, Ho–Rezvani advised that it appeared "clear that, prior to the commencement of the policy period of the Policy, you had a reasonable basis to believe that you had breached a professional duty to Mr. Clock or to foresee that a claim would be made against you." *See* Tamarack's Ex. 17 (Ho–Rezvani letter).

On May 2, 1997, Worth accepted process on the malpractice action and forwarded a copy of the complaint to his insurance agent, who forwarded it to Tamarack. On May 9, 1997, Ho–Rezvani sent Worth a second letter repeating the basis for the refusal to defend Worth in the malpractice action. *See* Tamarack's Br.Summ.J. at 13.

Despite these efforts, Worth contends that Tamarack should have taken "statements," engaged in an "evaluation" of the merits of the underlying malpractice claim, and reviewed the file of the Chapter 7 bankruptcy proceedings. Pl.'s Br.Summ.J. at 13. Worth asserts that if defendants had done so they would have learned that Worth filed a bankruptcy petition for Clock and therefore had no reasonable ba-

sis to believe he breached a professional duty when this Court dismissed the ASCS action. Yet, as we have discussed previously, the bankruptcy filing occurred well after Worth neglected his duty to manage Clock's ASCS action and played no role in this Court's dismissal of that case. Moreover, taking "statements" (aside from Ho–Rezvani's discussion with Worth), and "evaluating" the underlying claim, would not have affected the undisputed facts that the ASCS action had been dismissed due to Worth's error and omission and that Worth had received a copy of this Court's Entry confirming the dismissal and the basis for it.

In short, we hold that the defendants acted reasonably in refusing to defend the underlying malpractice complaint based upon the materials they reviewed and the actions they took prior to excluding Worth's claim from policy coverage. Most importantly, defendants made a coverage determination by relying upon a federal district court opinion that confirmed that relevant allegations in the underlying complaint, namely, that Worth's unexcused failure to effect service of process upon the United States in the ASCS action, as mandated by a federal rule of civil procedure, resulted in a permanent dismissal of his client's claim. Upon speaking with Worth and confirming both his receipt of this Court's Entry and his actual knowledge of the dismissal prior to the effective date of policy coverage, defendants reasonably concluded that the underlying malpractice action was excluded under the unambiguous policy language. To the extent that defendants had a duty to conduct a reasonable investigation into the facts underlying the malpractice complaint, they clearly have done so given both the materials and the judicially-established factual record at their disposal when refusing to defend Worth in the malpractice action.

Additionally, Worth alleges that defendants' investigation was not sufficiently exhaustive, which evidences bad faith and demonstrates their breach of an implied

covenant of good faith and fair dealing. *See* Pl.'s Am.Compl. ¶ 9. However, Worth's claim gauntly starves from a barren record, as Worth has adduced no evidence remotely suggestive of defendants' bad faith in refusing to defend Worth against Clock's malpractice claim.

 Under Indiana law, an insurer has an obligation of good faith and fair dealing with respect to the discharge of the insurer's contractual obligation. *Erie Ins. Co. v. Hickman,* 622 N.E.2d 515, 518–20 (Ind.1993). An insurer has an obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim. *Id.* at 519. If an insurer acts in bad faith in processing an insured's claim, the insured may bring actions for (1) a breach of the covenant of good faith and fair dealing that is implied in every insurance contact, and (2) tortious breach of the insurer's fiduciary duty of good faith to its insured. *See Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 979–981 (7th Cir. 1996) (applying Indiana law). Either way, bad faith is a requisite showing. *Id.*

 The Indiana Supreme Court has held that "the lack of diligent investigation alone is not sufficient to support an award" for bad faith. *Erie,* 622 N.E.2d at 520. "[A] good faith dispute about . . . whether the insured has a valid claim at all will not supply the ground for a recovery in tort for the breach of the obligation to exercise good faith . . . even if it is ultimately determined that the insurer breached its contract." *Id.* An insurer may be considered to have acted in bad faith where it "denies liability knowing that there is no rational, principled basis for doing so." *Id.* Yet, poor judgment or negligence do not amount to bad faith since the "additional element of conscious wrongdoing must also be present." *Colley v. Indiana Farmers Mut. Ins. Group,* 691 N.E.2d 1259, 1261 (Ind.Ct.App.1998).

 Worth offers no evidence whatsoever that Worth acted in bad faith when defendants investigated his claim and refused to defend him in Clock's malpractice action. Defendants twice provided Worth with unambiguous written notices that they would not provide him a defense and the rationale for not doing so. As we have explained above in detail, defendants' basis for excluding the malpractice action from policy coverage not only was rational and principled, but also was correct as a matter of law. Thus, Worth has failed to demonstrate a triable issue of material fact with respect to his claim that the defendants acted in bad faith in investigating and denying his claim for policy coverage. Accordingly, we *GRANT* defendants' motions for summary judgment on Worth's bad faith claim, and we *GRANT* defendants' motions for summary judgment to declare that they have no duty to defend or indemnify Worth in the underlying malpractice action brought against him by his former client. Likewise, we *DENY* Worth's motion for summary judgment both on his bad faith claim and on his request for a declaratory judgment to establish defendants' duty to defend him in the underlying malpractice action.

### *Conclusion*

For the reasons discussed, we *GRANT* defendants' motions for summary judgment as to Worth's bad faith claim, and we *GRANT* defendants' motions for summary judgment to declare that they have no duty to defend or indemnify Worth in Larry Clock's legal malpractice action. Similarly, we *DENY* plaintiff Worth's motion for summary judgment on his bad faith claim, and we *DENY* his motion for summary judgment on his declaratory judgment action seeking to establish defendants' duty to defend and indemnify him in the underlying malpractice action.